**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE M. ZESSAR | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05 C 1917 |
| v. | ) | |
| | ) | |
| WILLARD R. HELANDER, Lake County | ) | HONORABLE DAVID H. COAR |
| Clerk, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.   BACKGROUND FACTS**[1]

    **A.   Plaintiff and the November 2004 Election**

Plaintiff Bruce M. Zessar is a resident of Lake County, Illinois, but works in Chicago's Loop area. In early October 2004, Zessar contacted the Lake County Clerk's office about requesting an absentee ballot because he expected to be absent from Lake County on Election Day that year. Zessar received an absentee ballot application and an absentee ballot by mail. He completed the application and returned it to the Clerk's office by mail, after checking the box indicating that he expected to be absent from Lake County and would be unable to vote in person at his precinct. Zessar provided his name, address, and business telephone number on the absentee ballot application, but did not provide his email address although there was space provided. In addition, he voted the absentee ballot, signed and dated the certification form on the

---

[1] Unless otherwise stated, these facts are taken from the parties' L.R. 56.1 submissions.

-1-

accompanying envelope on October 4, 2004, and returned it by mail to the Lake County Clerk's Office, well before the November 2, 2004 General Election.

On Election Day, Zessar was absent from Lake County during polling hours. He took the 5:50 a.m. commuter train from Highland Park, Illinois (in Lake County) to the Loop and returned on the 7:00 p.m. commuter train from Chicago. During the days immediately before and after Election Day, Zessar did not leave the greater Chicago and Lake County area.

In mid-January 2005, some two and a half months after the November 2004 election, Zessar received a yellow Notice of Challenge postcard by mail from the Lake County Clerk's office. The Notice of Challenge card, which had been prepared on the night of the election by Lake County election judges, informed Zessar that election officials in Moraine Precinct number 215 (Lake County) had determined that Zessar's signature on his absentee ballot did not match the signature on file on his voter registration card and that his ballot had been rejected. All parties now agree that this determination was erroneous. Zessar's vote was not cast and did not count in the election results. For the November 2004 election, Lake County reported 538 rejected ballots from a total of 458 precincts.

The final election results for Lake County had been posted on the County Clerk's website on November 17, 2004, approximately two weeks after Election Day. The results were labeled "unofficial," although the Lake County operations manager state that they were final. Under Illinois law, county offices were required to complete the abstract of votes and official canvass for county offices by November 23, 2004. The Illinois State Board of Elections must complete the official canvass and abstract of votes for state and judicial offices by 31 days after the election.

The Illinois Election Code and related regulations require that a rejected absentee voter must receive notice of the ballot rejection but otherwise give no guidance about the time frame in which such notice must be given. State law makes no provision for a rejected absentee voter to challenge the ballot rejection or to have any form of hearing prior to the rejection of the ballot or completion of the official canvass.

### B. Illinois Election Authorities

The Illinois State Board of Elections ("The State Board") is an independent state agency created to supervise voter registration and the administration of elections throughout Illinois. Locally, elections are administered by the state's 110 election authorities, which consist of the county clerks in Illinois' 101 counties, one county election commission, and eight municipal election commissions. These local election authorities oversee local voter registration programs, train election judges,[2] identify polling places, get ballots printed, oversee election day activities, and supervise the local vote count. The State Board works with the election authorities by providing oversight and guidance, including ongoing training programs for authorities. Both the State Board and the local election authorities are governed by the Illinois Election Code and its provisions regarding absentee ballot procedures.

---

[2] In Lake County, for example, there are over 6,000 individuals in the Election Judge Pool. Of these, 2,2522 Election Judges served on November 2, 2004.

### C. Absentee Ballot Procedures

Under the Illinois Election Code, absentee ballots received prior to Election Day are placed, unopened, together with the absentee ballot application in a large, securely sealed envelope, which is endorsed by an official of the election authority with the words, "This envelope contains an absent voter's ballot and must be opened on election day." 10 Ill. Comp. Stat. 5/19-7. The envelopes are kept in the election official's office until Election Day, when they are delivered to the polling place of the precinct where the voter resides. 10 Ill. Comp. Stat. 5/19-8. Election judges at each precinct "cast" absentee ballots at the close of polls on Election Day. State law provides that the election judges shall open the outer envelope, announce the absent voter's name, and compare the signature on the application with the signature on the ballot envelope. If the signatures do not correspond, the applicant is not a duly qualified voter, the ballot envelope is open or has been opened and resealed, or the voter has voted in person on Election Day, the absentee ballot will be left unopened and on its face shall be marked "Rejected," along with the reason therefor. 10 Ill. Comp. Stat. § 5/19-9. The Election Code further provides that if a challenge to an absentee ballot is sustained, "notice of the same must be given by the judges of election by mail addressed to the voter's place of residence." 10 Ill. Comp. Stat. 5/19-10.

The State Board publishes manuals for local election officials. Under regulations contained in these instruction manuals, a majority of the election judges decides whether a challenged ballot will be counted. Acceptable reasons in addition to those provided by the Illinois Election Code include: the voter filled out the certification envelope incompletely; the information in the certificate is incorrect; the signature and/or address on the application do not

match the signature and/or address on the verification record or on the certification envelope; the individual is not a qualified voter; or the individual died prior to the opening of polls on Election Day.

After agreeing to reject an absentee ballot, the election judges complete and sign a Notice of Challenge card (a yellow postcard) provided by the election authority. The election judges return the notice of challenge cards to the election authority, along with all election materials, on election night. The election authority then mails the card to the voter. Lake County's Election Judge Manual directed election judges to follow this procedure with respect to rejected absentee ballots in 2004.

### D. Lake County and November 2004 Election

Lake County directed its precinct election judges to put all notice of challenge postcards in a red voting materials bag at the end of the evening and return the bags to the election authority headquarters. If there is the possibility of a discovery recount, all election materials, including the red bags, are sequestered. Such a discovery recount or election contest period does not commence until the final canvass of votes, which is not completed until 21 days after election day. The notice of challenge postcards would not be mailed until the end of the discovery recount period. If there is no possibility of a discovery recount or the recount period has ended, the red bag is opened and the envelope (Envelope #3) containing the notice of challenge postcards is removed and sent to the absentee ballot department. This department removes the postcards from Envelope #3 and mails them. In all, the process takes one to two weeks after the election.

For the November 2004 election, Lake County issued 26,578 absentee ballot applications and absentee ballots. Voters returned 23,506 absentee ballots to the Clerk's office. The absentee ballot application form used in Lake County provides space for absentee voters to provide a telephone number and email address. In the event that a "facially incomplete" application is returned well before the election or a court decrees that a candidate appear or not appear on a ballot after the ballots are printed and the absentee voting period has commenced, the Clerk's office may attempt to contact that absentee voter in order for the voter to complete the application fully or to vote the corrected ballot. Of the absentee ballot applications for the November 2004 election, approximately fifty percent lacked both an email address and a telephone number.

A total of 3,696 active voters in Lake County are enrolled in the absent student, nursing home resident, disabled, or "snowbird" voter programs administered by the County Clerk. There are approximately 4,000 additional voters serving in the military or residing overseas. Voters enrolled in these programs automatically receive an absentee ballot application and an absentee ballot; they do not have to make a specific request.[3] Of the absentee ballot requests from individuals not enrolled in these programs for the November 2004 election, approximately fifty percent were mailed to voters at addresses outside Illinois.

Five hundred thirty-eight absentee ballots submitted in Lake County were rejected on election night in November 2004. Of these, the Clerk's office received inquiries from approximately five individuals, including Zessar, after they received their rejection notification postcards.

---

[3] The Lake County Clerk's office has a current mailing address on file for these voters.

Elections place additional burdens on county clerk's offices. For the November 2004 election, thirty-nine permanent and temporary employees at the Lake County Clerk's office were assigned to election duties. Several of these employees were diverted from their regular duties in the Tax, Vital Records, and County Board Record Departments. On Election Day, 213 additional temporary workers and volunteers assisted with opening and closing polls, replenishing supplies, handling technical problems and delivering absentee ballots. Fifteen people worked until approximately one a.m. on November 3, 2004, to finish unloading all election materials from precinct locations at the Clerk's office. From November 3, 2004 until at least January 1, 2005, Clerk's office staff were engaged in performing all their post-election statutory duties.

There were a total of 688 provisional ballots cast in Lake County during the election. Eight full time staff members worked six hours a day to process the provisional ballots completely. Of the total, 199 were found to be valid and were cast. Provisional voters are individuals who voted in person on Election day but whose registration could not be verified. Instead, they signed affidavits attesting that they were registered and eligible to vote. A provisional voter has two calendar days following the election to provide any required additional documents to the Clerk's office and the Clerk's office has fourteen calendar days after the Election to validate and, if appropriate, count the provisional ballots. 10 Ill. Comp. Stat. 5/18A-15(d). No more than ten provisional voters actually contacted the Clerk's office.

On November 2, 2004, there was a possibility of a discovery recount because the race for County Coroner was decided by a very small margin. Accordingly, the Lake County officials did not allow envelopes or other material to be opened until after the period for discovery recount had ended. Lake County officials determined that the Coroner's race was entitled to a discovery

recount upon the completion of the election canvass. The unsuccessful candidate for Lake County Coroner, however, did not pursue his statutory right to a discovery recount during the allotted time period.

After receiving a Notice of Challenge postcard, a voter is free to re-register and update his or her signature on the registration file.

### E. November 2004 Absentee Voting In Illinois

The State Board was required to submit data to the United States Election Assistance Commission after the November 2004 election. A State Board questionnaire sent to each election authority sought data on the total number of absentee ballots requested, the total number of absentee ballots returned, and the total number of absentee ballots counted. Not all counties reported the total number of absentee ballots counted.

### F. Zessar Files Suit In Federal Court

On April 1, 2005, Zessar brought a class action complaint against Willard Helander, the Lake County Clerk, the Lake County Board of Elections, Lake County Election Judges, the Illinois State Board of Elections and the members thereon. Zessar claims that the lack of notice and an opportunity to rehabilitate his absentee ballot before the official election canvass date violated his constitutional right to due process under the Fourteenth Amendment to the United States Constitution. As relief, Zessar asks this Court to declare unconstitutional certain provisions of the Illinois Election Code which relate to absentee voting, to order the State Board of Elections to require pre-deprivation notice and hearing to absentee voters whose ballots are challenged, to award reasonable attorney's fees and costs, and to grant other such legal or equitable relief as the Court finds proper. Plaintiff also filed a motion for certification of both a

plaintiff and a defendant class in this matter, which this Court granted. Presently before the Court are motions for summary judgment filed by Zessar, by Willard Helander, and by the Illinois State Board of Elections. These motions have been fully briefed and are ripe for decision.

## II. STANDARD OF REVIEW

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001). "If, however, the record as a whole 'could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* Once a motion for summary judgment has been filed, "the burden shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial." *Liu v. T&H Machine, Inc.*, 191 F.2d 790, 796 (7th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-movant must provide more than a "mere scintilla" of evidence to carry its burden under the summary judgment standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, weighing evidence, making credibility determinations, and drawing reasonable inferences are functions of a jury, not of a judge deciding a summary judgment motion. *Id.* at 255.

### III. ANALYSIS

Zessar alleges that the Illinois Election Code violates his right to procedural due process because it does not require timely notice and an opportunity for a hearing prior to the official canvass date. Put another way, Zessar contends that the lack of timely notice and hearing under Illinois law works to deprive him of his fundamental right to vote. Plaintiff's argument is that the right to vote is a fundamental right, afforded the fullest constitutional protection. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Ill. State Bd. Of Elections v. Socialist Worker's Party*, 440 U.S. 173, 184 (1979). The right to vote by absentee ballot is not, in and of itself, a fundamental right. But once the State permits voters to vote absentee, it must afford appropriate due process protections, including notice and a hearing, before rejecting an absentee ballot. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990). Defendants Helander and the State Board deny that this case addresses the right to vote. Instead, they contend that the issue turns on whether there is a constitutional interest in the right to vote absentee. Defendants also seek to characterize this as a case about Zessar's particular experience. As such, they characterize the facts as representing a "garden variety" election irregularity, with which federal courts should not interfere. *Dieckhoff v. Severson*, 915 F.2d 1145, 1150 (7th Cir. 1990).

#### A. Procedural Due Process

It is undisputed that the right to vote is a fundamental right under the United States Constitution. *Harper v. Va. Bd. of Elections*, 383 U.S. 662, 666 (1966). In this case, however, the parties disagree about whether due process protects the rights of an absentee voter. Perhaps the easiest way to answer the question is to examine what is ultimately at stake. Under the Illinois Election Code, an absentee voter in Illinois completes, certifies, and returns an absentee ballot to

her polling place at some point during the statutorily prescribed period. She then must wait until some time after the election to learn if her ballot was challenged and rejected. She has no opportunity to oppose the rejection or to demonstrate that it was erroneous. Her vote simply does not count in the election. At best, she has the opportunity to re-register so as to prevent a future rejection.

There is no question that the federal constitution does not require states to create absentee voting regimes. *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969). States may regulate absentee voting and determine who qualifies to vote absentee. The right to receive an absentee ballot is not the same as the right to vote, and will not receive the same constitutional protection. *Id*. It is not unconstitutional, for example, for a state to refuse to permit working mothers *qua* working mothers to vote by absentee ballot even though it might be a great hardship to require them to vote in person on Election Day. *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004). Defendants correctly assert that state regulations or restrictions on absentee voting do not, as a general matter, violate a fundamental constitutional right. *McDonald*, 394 U.S. at 810-11; *Griffin*, 385 F.3d at 1130-31; *Prigmore v. Renfro*, 356 F. Supp. 427, 433 (N.D. Ala. 1972). But once they create such a regime, they must administer it in accordance with the Constitution. *Paul v. Davis*, 424 U.S. 693, 710-12 (1976) (an otherwise protected interest can attain "constitutional status by virtue of the fact that [it has] been initially recognized and protected by state law" if "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished"). An absentee voter, by definition, is someone who is unable to vote in person because of physical absence or incapacity. By creating an absentee voter regime, the state has enabled a qualified individual to exercise her fundamental right to vote in a

way that she was previously unable to do. The Lake County Clerk contends that an absentee voter has no right or status as an approved absentee voter until her ballot is reviewed and accepted by the election judges on election night. This proves too much. By this logic, an in-person voter has no right or status as an approved voter until her identity as a registered voter has been reviewed and accepted at the polling place. But the in-person voter has a right to due process. Under Helander's argument, the absentee voter does not.[4] This Court finds that the state's action in creating an absentee voting program served to alter the rights of those electors who participate in the program. Accordingly, approved absentee voters are entitled to due process protection. Under the Illinois Election Code, such voters risk the deprivation of their vote, a liberty interest, based on factual issues relating to their ballot.

### B. What Process is Due

Due process is "flexible and calls for such procedural safeguards as the situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To determine what process is due, a court must balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The court also must balance the interests the state asserts as justification for a rule restricting voting against the nature and degree of asserted injury to a

---

[4] Helander contends that an elector, such as Zessar, always has the option of voting in person rather than taking advantage of the statutorily-provided absentee voting regime. But that misstates the issue. The absentee voting provisions do not–and could not–distinguish between classes of absentee voters and offer differing levels of procedural protection depending on the relative hardship the class members might face in getting to the polls in person.

plaintiff's First and Fourteenth Amendment rights. *Burdick*, 504 U.S. at 434 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

1. **Private Interest**

Zessar contends that the private interest at stake is the right of approved and statutorily-compliant absentee voters to cast their votes. [5] Once the state approves a qualified individual to vote by absentee ballot, he contends that it violates due process to reject the absentee ballot without providing notice and a pre-deprivation hearing. The State Board and Helander deny that there is a liberty interest present in an absentee voting program. In particular, Helander argues that Plaintiff's primary case law support for the proposition that absentee balloting is entitled to some minimal amount of due process is inapplicable. In *Raetzel v. Parks/Bellemont Absentee Election Board*, 762 F. Supp. 1354 (D. Ariz. 1990), a federal district court in Arizona held that Arizona's statutory scheme regarding absentee ballots violated constitutional due process requirements because it did not provide for notice and a hearing for voters whose ballots were rejected. Under applicable Arizona law, only county political party chairmen received notice of a disqualified vote, and then only if the challenge was made in writing. The political parties were under no obligation to notify the individual voter about the disqualification. *Id*. at 1357. The *Raetzel* court described absentee voting as "a convenience for those unable to vote in person." *Id*. at 1358 (citing *Prigmore v. Renfro*, 356 F. Supp. 427, 432 (N.D. Ala. 1972), *aff'd* 410 U.S. 919 (1973). It then went on to characterize absentee voting as "deserving of due process," and

---

[5] Zessar does not contend, as Defendants seem to suggest, that all absentee ballots, even those validly rejected for statutory noncompliance must be counted. Rather, he argues that all approved absentee voters have the right to notice and a pre-deprivation hearing before their ballots are rejected and their right to vote violated.

stated that "[the state] cannot disqualify ballots, and thus disenfranchise voters, without affording the individual due process protection.... [such as] advising the individual of the disqualification and the reason therefor[], and providing some means for the individual to make his or her position on the issue a matter of record before the appropriate election official." *Raetzel*, 762 F. Supp. at 1358.

This Court finds that under the current statutory system, the election judges' rejection–erroneous or not–wholly deprives an absentee voter of the right to vote. There is no recourse for the voter and no way to remedy the loss of that vote in that election.

### 2. Risk of Erroneous Deprivation and Probable Value of Additional Procedures

The risk of erroneous deprivation of a protected voting right is admittedly not tremendous, but there is a risk. For the 2004 General Election, the parties estimate that at least 1,100 absentee ballots were rejected. By contrast, at least 253,221 absentee ballots were returned to election authorities and 191,177 absentee ballots were counted. These numbers fail to give the full picture, however, because not all counties reported the number of absentee ballots counted.

Plaintiff proposes that Notice of Challenge postcards should be mailed to the address on file for the voter as soon as possible after the election, but in no event more than a few days thereafter. He then envisions a kind of "informal" administrative hearing conducted by an employee of the election authority to confirm that the absentee ballot in fact belongs to the voter. An absentee voter whose ballot had been challenged could submit identification in person or via written affidavit.[6] At that point, Zessar contends, the ballot in most instances would be

---

[6] Zessar compares the process of showing valid identification with the "everyday" process of going through an airport or government building security checkpoint.

sufficiently validated and could be counted. On behalf of Lake County, defendant Helander contends that the risk of erroneous deprivation is very small. The Illinois Election Code provides only limited grounds for election judges to reject an absentee ballot, based on: finding that signatures do not correspond; that the applicant is not a registered voter in that precinct; that the absentee ballot envelope has been sealed and then opened and re-sealed (suggesting some kind of ballot tampering); that the absentee voter also voted in person on Election Day; or that the voter is known to have died before the start of the polling hours on Election Day. 10 Ill. Comp. Stat. 5/19-9. Election judges, being human, may make mistakes, but Helander argues that such mistakes, if made without invidious or fraudulent intent, are not redressable in federal court. The State Board contends that Zessar's proposed remedy of immediate notice and a hearing prior to the official canvass date[7] is "hugely disproportionate" to the problem. Further, the State Board questions whether the proposed procedure would remedy the deprivation for absentee voters in other factual situations, such as those who are students at colleges and universities out of their home district, military service members serving out of state or overseas, "snowbirds" living out of state for part of the year, or nursing home or hospital residents with mobility limitations.

In addition, the State Board questions the value of additional procedures in preventing what was, in the instant case at least, a good-faith mistake during the signature verification stage. Plaintiff's response is that additional procedures would provide a way to safeguard his protected interest in voting. Helander contends that Zessar can offer no guarantees that the additional

---

[7] For all practical purposes, the pre-deprivation hearing would occur within the two week period immediately following Election Day. This is also the time period during which election authorities are verifying provisional votes. 10 Ill. Comp. Stat. 5/18A-15(a).

safeguards he seeks would be effective.[8] In particular, Helander contends that sending notice of challenge postcards to the voter's Lake County address (on file with the voter registration) would be ineffective for voters who were out of the county for an extended time period.[9]

This Court finds that a post-deprivation hearing provides only prospective relief in that it allows the rejected voter to correct something about her registration for future elections. The fact that Zessar and his fellow rejected absentee voters may have been deprived of their vote through a good-faith error, rather than outright fraud, does not eliminate their due process interest in preserving their right to vote. Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing. The voter's right to vote would have been irremediably denied. The defendants belief that timely notice and a pre-deprivation hearing would provide little additional value to the effort to protect the voters' interests in their voting right is unpersuasive. It is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote.

### 3. Government's Interest

The third factor in the *Mathews* balancing test examines the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335 (citing *Goldberg v.*

---

[8] This Court notes that Lake County already provides some additional protection to certain absentee voters who submit "facially incomplete" ballots prior to Election Day. The Clerk may contact the voter and invite her to complete the ballot fully.

[9] Helander does not explain why notice of challenge postcards could not be sent to the address where the absentee ballot was sent.

*Kelly*, 397 U.S. 254, 263-71 (1970)). Zessar maintains, in rather conclusory fashion, that the burden of additional procedure on the government would be slight. Although the parameters of the hearing he envisions are unclear, he asserts that an affidavit form could be created and sent to rejected absentee voters, who could then return it in person or by mail or fax. He also notes that the process would involve a relatively small number of individuals. By way of example, of the 688 provisional voters in Lake County in the November 2004 election, no more than 10 contacted the Clerk's office after the election. For the same election, Lake County reported 528 rejected absentee ballots.

The defendants cry foul with regard to the burden of additional procedures. They note that election authorities face a cascade of statutory obligations in the time period leading up to and following the election, which has only increased with the advent of in-person absentee voting or "early voting" in Illinois in the March 2006 election. 10 Ill. Comp. Stat. 5/19-2.1. In Lake County, election authority staff worked six hours per day for fourteen days after the election to validate the 688 provisional voters who voted in the election. Additional procedure relating to absentee voters would be an untenable burden, according to Defendants. This Court is not convinced by Defendants' parade of horribles. For one thing, absentee voters and provisional voters stand in different positions before the election authority. Under Section 19-4 of the Illinois Election Code, upon receipt of an application to vote absentee,[10] an election authority must examine voter registration records to verify that the applicant is "lawfully entitled to vote as

---

[10] By law, applications to vote absentee must be received at the appropriate election authority by mail not more than 40 days nor less than 5 days prior to the election or by personal delivery not more than 40 days nor less than one day prior to the election. 10 Ill. Comp. Stat. 5/19-4.

requested." 10 Ill. Comp. Stat. 5/19-4. Only after making such a determination is the absentee ballot itself issued. Thus, the burden on the election authority staff is much less than it is with regard to provisional ballots. 10 Ill. Comp. Stat. 5/18-1 *et seq.* The staff verifies that the voter is lawfully entitled to vote before the election, rather than during the fourteen days following the election. A process along the lines of that described by Zessar would pose some additional administrative and fiscal burden on the election authorities, but this Court finds that Defendants have not demonstrated that the burden would be so great as to overwhelm plaintiff's interest in protecting his vote.

## Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted in part and denied in part. Defendant Helander and Defendant Illinois State Board of Elections' motions for summary judgment are denied. This Court finds that the Illinois Election Code provisions regarding the casting of absentee ballots, 10 Ill. Comp. Stat. 5/19-9, violate absentee voters' due process rights. Although plaintiffs have been damaged by the rejection of their ballots, this Court does not find that economic damages are appropriate or that equitable relief is required beyond what is necessary to implement a constitutional absentee voting system. This Court does not reach the issue of attorney's fees and costs at this stage of the proceedings.

The parties shall submit proposed procedures for providing timely notice and pre-deprivation hearing to absentee voters whose ballots have been rejected to this Court by May 1, 2006.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **March 13, 2006**